UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

DAVID KING, *et al.*,

Plaintiffs,

v.

KATHLEEN SEBELIUS, *et al.*,

Defendants.

Civil Action No. 3:13–CV–630

## MEMORANDUM OPINION

THIS MATTER is before the Court on a Motion for Summary Judgment filed by Plaintiffs (ECF No. 5) and a Motion to Dismiss filed by Defendants (ECF No. 30). Plaintiffs move the Court for Summary Judgment alleging that a regulation promulgated by the Internal Revenue Service ("IRS"), which extends eligibility for premium assistance subsidies[1] under the Patient Protection and Affordable Care Act ("ACA" or "Act") to individuals who purchase health coverage through federally-facilitated Exchanges, exceeds the IRS's statutory authority, is arbitrary and capricious, and is contrary to law in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Defendants in turn move the Court to dismiss Plaintiffs' Complaint and uphold the relevant regulation. For the reasons below, the Court will GRANT Defendants' Motion to Dismiss and DENY AS MOOT all remaining Motions.

### I.     STATUTORY AND FACTUAL BACKGROUND

#### A. Statutory Background

The ACA includes a series of measures intended to expand the availability of affordable health insurance coverage. These measures include: (1) the creation of health insurance exchanges ("Exchanges") that facilitate the purchase of insurance by individuals and small groups; (2) the availability of premium tax credits to assist individuals with the purchase of

---

[1] The terms "tax credits," "premium assistance subsidies," and "premium assistance" are used interchangeably throughout this Memorandum Opinion.

insurance on the Exchanges; and (3) the Minimum Coverage Provision, which requires most individuals either to maintain qualifying coverage or to pay a tax penalty for failure to do so. The IRS has also promulgated a regulation ("IRS Rule") that grants premium tax credits to individuals in all Exchanges, regardless of whether they are state-run or federally-facilitated.

### 1. The American Health Benefit Exchange System

The ACA creates health insurance Exchanges, organized along state lines, to serve as a marketplace for the purchase of health insurance by individuals and small businesses. *See* 42 U.S.C. § 18031(b)(1). The Exchanges are intended to help qualified individuals and small businesses "to benefit from the pooling of risk, market leverage, and economies of scale that large businesses currently enjoy." Centers for Medicare & Medicaid Services, *Initial Guidance to States on Exchanges*, http://www.hhs.gov/cciio/resources/files/guidance_to_states_on_ exchanges.html (last visited Feb. 3, 2014). In part, the Exchanges: (1) certify the qualified health plans offered on the Exchanges; (2) determine the eligibility of individuals to enroll in these qualified health plans; (3) determine the eligibility of individuals for advance payments of the ACA's premium tax credits and cost-sharing reductions; and (4) certify that individuals are exempt from the penalty under the Act's Minimum Coverage Provision. 42 U.S.C. §§ 18021(a)(1), 18022; 42 U.S.C. § 18031(d)(4); *see generally* 45 C.F.R. § 155.200.

Exchanges will offer plans providing different levels of coverage, designated as "bronze," "silver," "gold," and "platinum" coverage. 42 U.S.C. § 18022(d). A bronze level plan is the lowest level of coverage offered under 42 U.S.C. § 18022(d)(1). Exchanges may also offer "catastrophic" coverage plans. 42 U.S.C. § 18022(e); *see* 45 C.F.R. § 156.155. Enrollment in catastrophic coverage is limited to persons who are under 30 years of age, or for whom an Exchange has certified to be exempt from the Minimum Coverage Provision due to hardship or the lack of affordable insurance options. 42 U.S.C. § 18022(e); 45 C.F.R. § 156.155(a).

States may establish and operate these Exchange pursuant to 42 U.S.C. § 18031 ("Section 1311"), or the federal government may establish and operate an Exchange in place of the state

where a state has chosen not to do so consistent with federal standards pursuant to 42 U.S.C. § 18041 ("Section 1321"). Thirty-four states, including Virginia, have decided not to establish their own Exchanges pursuant to Section 1311. *See State Decisions for Creating Health Insurance Marketplaces,* Kaiser State Health Facts, http://kff.org/health-reform/state-indicator/health-insurance-Exchanges/ (last visited Feb. 3, 2014).

### 2. Premium Tax Credits

Among other incentives, the ACA provides premium tax credits under 26 U.S.C. § 36B ("section 36B") to help low and middle income individuals afford the cost of insurance purchased through the Exchanges. The Exchanges provide advance payments of premium tax credits directly to an eligible individual's insurer, thus lowering the net cost of insurance to the individual. 42 U.S.C. §§ 18081-18082. The amount of premium assistance that an Exchange may provide for an eligible individual is based, in part, on the premium expenses for the health plan "enrolled in [by the individual] through an Exchange established by the State under [section] 1311." 26 U.S.C. § 36B(b)(2)(A). The amount of the premium tax credit available to a taxpayer under section 36B varies depending on the taxpayer's household income. However, premium tax credits are not available for the purchase of catastrophic coverage. 26 U.S.C. § 36B(c)(3)(A).

### 3. The Minimum Coverage Provision and Exemptions

Under the ACA's Minimum Coverage Provision, non-exempt individuals are required either to maintain a minimum level of health insurance or to pay a tax penalty. 26 U.S.C. § 5000A. This penalty in 2014 is one percent of an individual's yearly income or $95 for the year, whichever is higher, 26 U.S.C. § 5000A(c)(2)-(3), but it "cannot exceed the cost of 'the national average premium for qualified health plans' meeting a certain level of coverage." *Liberty Univ., Inc. v. Lew,* 733 F.3d 72, 84 (4th Cir. 2013) (quoting 26 U.S.C. § 5000A(c)(1)(B)). Certain individuals may be exempt from the mandate to maintain a minimum level of health insurance under 26 U.S.C. § 5000A(e). Among other exemptions, the Minimum Coverage Provision penalty does not apply to individuals who would need to contribute more than eight percent of

3

their household income toward coverage. 26 U.S.C. § 5000A(e)(1)(A). The determination of an individual's household income toward coverage is calculated after taking into account any allowable section 36B premium tax credits. 26 U.S.C. § 5000A(e)(1)(B)(ii).

An individual who applies for an exemption and is denied may pursue an administrative appeal of that denial before a Department of Health and Human Services ("HHS") appeals entity. 42 U.S.C. § 18081(f). An appeal may be taken only after the applicant first exhausts any appeals that may be available in the Exchange. 45 C.F.R. §§ 155.505(b)(2), (c). This process is independent of the IRS's assessment of any penalty under the Minimum Coverage Provision. *See* 26 U.S.C. § 5000A(g).

### 4. The IRS Rule

The IRS Rule grants subsidies to anyone "enrolled in one or more qualified health plans through an Exchange." *See* Health Insurance Premium Tax Credit, 77 Fed. Reg. 30,377, 30,377-78, 30,387-89 (May 23, 2012); 26 C.F.R. § 1.36B-2(a)(1). The IRS Rule defines "Exchange" to mean "State Exchange, regional Exchange, subsidiary Exchange, and Federally-facilitated Exchange." *Id.* at 30,378. According to IRS regulations, the term Exchange has "the same meaning as in 45 C.F.R. § 155.20." 26 C.F.R. § 1.36B-1(k). Finally, 45 C.F.R. § 155.20 defines Exchange to mean:

> a governmental agency or non-profit entity that meets the applicable standards of this part and makes [Qualified Health Plans] available to qualified individuals and/or qualified employers. . . . *regardless of whether the Exchange is established and operated by a State (including a regional Exchange or subsidiary Exchange) or by HHS.*

45 C.F.R. § 155.20 (emphasis added). As such, individuals in federally-facilitated Exchanges are currently eligible for the premium tax credit under the IRS Rule.

### B. Factual Background[2]

---

[2] For the purposes of Defendants' Motion to Dismiss, the Court assumes all of Plaintiffs' well-pleaded allegations to be true, and views all facts in the light most favorable to Plaintiffs. *T.G. Slater & Son v. Donald P. & Patricia A. Brennan, LLC*, 385 F.3d 836, 841 (4th Cir. 2004) (citing *Mylan Labs, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)); *see* Fed. R. Civ. P. 12(b)(6).

### 1. David King

David King ("King") was 63 years old on January 1, 2014; he is married with no dependents; he smokes tobacco products; and he has a projected household income of $39,000 for 2014. King is not eligible for government or employer-sponsored coverage, so the cheapest coverage available to him is the cheapest bronze coverage approved for sale to him on the federal Exchange in Virginia. Because the cost of the cheapest bronze coverage approved for sale to King on the federally-facilitated Exchange in Virginia will exceed eight percent of King's projected household income for 2014, he would (absent any subsidy) be eligible for a certified exemption from the Minimum Coverage Provision penalty for 2014. King is, however, eligible for a subsidy that would bring him within the ambit of the Minimum Coverage Provision. King does not wish to comply with the Minimum Coverage Provision.

### 2. Douglas Hurst

Douglas Hurst ("Hurst") was 62 years old on January 1, 2014; he is married with no dependents; and he has a projected household income of $35,000 for 2014.[3] Hurst is not eligible for government or employer-sponsored coverage, so the cheapest coverage available to him is the cheapest bronze coverage approved for sale to him on the federally-facilitated Exchange in Virginia. Because the cost of the cheapest bronze coverage approved for sale to Hurst on the federally-facilitated Exchange in Virginia will exceed eight percent of Hurst's projected household income for 2014, he would (absent any subsidy) be eligible for a certified exemption from the Minimum Coverage Provision penalty for 2014. Hurst is, however, eligible for a subsidy that would bring him within the ambit of the Minimum Coverage Provision. Hurst does not want to comply with the Minimum Coverage Provision.

### 3. Brenda Levy

Brenda Levy ("Levy") was 63 years old on January 1, 2014; she is single; and she has a projected household income of $43,000 for 2014. Levy is not eligible for government or

---

[3] Due to counsel's error, the Complaint alleged the wrong figure.

employer-sponsored coverage, so the cheapest coverage available to her is the cheapest bronze coverage approved for sale to her on the federally-facilitated Exchange in Virginia. Because the cost of the cheapest bronze coverage approved for sale to Levy on the federally-facilitated Exchange in Virginia will exceed eight percent of Levy's projected household income for 2014, she would (absent any subsidy) be eligible for a certified exemption from the Minimum Coverage Provision penalty for 2014. Levy is, however, eligible for a subsidy that would bring her within the ambit of the Minimum Coverage Provision. Levy does not want to comply with the Minimum Coverage Provision.

### 4. Rose Luck

Rose Luck ("Luck") was 55 years old on January 1, 2014; she is married; she smokes tobacco products; and she has a projected household income of $45,000 for 2014. Luck is not eligible for government or employer-sponsored coverage, so the cheapest coverage available to her is the cheapest bronze coverage approved for sale to her on the federal Exchange in Virginia. Because the cost of the cheapest bronze coverage approved for sale to Luck on the federally-facilitated Exchange in Virginia will exceed eight percent of Luck's projected household income for 2014, she would (absent any subsidy) be eligible for a certified exemption from the Minimum Coverage Provision penalty for 2014. Luck is, however, eligible for a subsidy that would bring her within the ambit of the Minimum Coverage Provision. Luck does not want to comply with the Minimum Coverage Provision.

## II.    LEGAL STANDARD

Rule 12 of the Federal Rules of Civil Procedure allows a defendant to raise a number of defenses to a complaint at the pleading stage, including failure to state a claim. A motion to dismiss for failure to state a claim upon which relief can be granted challenges the legal sufficiency of a claim, rather than the facts supporting it. Fed. R. Civ. P. 12(b)(6); *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007); *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). A court ruling on a Rule 12(b)(6) motion must accept all of the factual

allegations in the complaint as true, *see Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999); *Warner v. Buck Creek Nursery, Inc.*, 149 F. Supp. 2d 246, 254-55 (W.D. Va. 2001), in addition to any provable facts consistent with those allegations, *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984), and must view these facts in the light most favorable to the plaintiff, *Christopher v. Harbury*, 536 U.S. 403, 406 (2002).

To survive a motion to dismiss, a complaint must contain factual allegations sufficient to provide the defendant with "notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Rule 8(a)(2) requires the complaint to allege facts showing that the plaintiff's claim is plausible, and these "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 & n.3. The Court need not accept legal conclusions that are presented as factual allegations, *id.* at 555, or "unwarranted inferences, unreasonable conclusions, or arguments," *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).

## III.   ANALYSIS

### A.  Justiciability

#### 1.    Standing

The doctrine of standing is comprised of two analytical strains. *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004). The first regards Constitutional limitations on the Court's adjudicative capacity and is rooted firmly in Article III. There, the judicial power of the United States is said to extend only to a limited class of "cases" and "controversies." U.S. Const. art. III, § 2. To establish Article III standing, it must be shown: (1) that the plaintiff suffered the invasion of a legally protected interest; (2) that there is a fairly traceable causal connection between the injury alleged and the conduct challenged; and (3) that there is a reasonable likelihood that the injury alleged could be redressed by a favorable decision from the court. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "[T]hreatened injury must be certainly

7

impending to constitute injury in fact," and "[a]llegations of possible future injury" are not sufficient. *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1141 (2013) (quotation marks omitted) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

There is also prudential standing where "[t]he interest [a person] asserts must be 'arguably within the zone of interests to be protected or regulated by the statute' that he says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012) (quoting *Assoc. of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)); *see also Taubman Realty Grp. Ltd. P'ship v. Mineta*, 320 F.3d 475, 480 (4th Cir. 2003). This test is not especially demanding, and any benefit of the doubt goes to the plaintiff. *Patchak*, 123 S. Ct. at 2210. "[T]his inquiry must be determined not by reference to the overall purpose of the statute in question but, instead, by reference to the particular provision(s) of law upon which the plaintiff seeks redress." *Mineta*, 320 F.3d at 480 (citations omitted); *see also Bennett v. Spear*, 520 U.S. 154, 175–76 (1997). "The test forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Patchak*, 132 S. Ct. at 2210; *TAP Pharm. v. U.S. Dep't of Health & Human Servs.*, 163 F.3d 199, 203 (4th Cir. 1998).

a. Article III Standing

Defendants assert that Plaintiffs cannot establish standing because they are not being economically injured by the IRS Rule. Instead, they characterize Plaintiffs' actions as the rejection of a benefit in an attempt to manufacture harm where there is none. Plaintiffs assert that they are harmed economically because the IRS Rule denies them an exemption from the Minimum Coverage Provision and, thus, the option not to buy any health insurance at all. Plaintiffs argue that, as a result of the IRS Rule, they will incur some financial cost because they will be forced to buy insurance or pay the Minimum Coverage Provision penalty. In the

8

alternative, Plaintiffs also assert that being forced to buy insurance and having to contact insurers are cognizable Article III injuries.

The Court assumes that "the merits of a dispute will be resolved in favor of the party invoking . . . jurisdiction in assessing standing and, at the pleading stage, 'presumes that general allegations embrace those specific facts that are necessary to support the claim.'" *Equity In Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 99 (4th Cir. 2011) (quoting *Lujan v. National Wildlife Federation,* 497 U.S. 871, 889 (1990)). It follows that Plaintiffs have standing because their economic injury is real and traceable to the IRS Rule. *Halbig v. Sebelius*, No. CV 13-0623 (PLF), 2014 WL 129023, at *6 (D.D.C. Jan. 15, 2014). Lastly, Plaintiffs clearly meet the third prong of the standing doctrine because this Court has the power to redress their injuries by invalidating the IRS Rule.[4]

### b. Prudential Standing

The prudential standing doctrine has been stated in many different forms and iterations. Under Fourth Circuit jurisprudence, the relevant focus is on the particular provision of the law upon which the plaintiff seeks redress. *See Syngenta Crop Prot., Inc. v. EPA*, No. 1:02-CV-334, 2011 WL 3472635, at *7-8 (M.D.N.C. Aug. 9, 2011) (citing *Mineta,* 320 F.3d at 480). To determine whether a plaintiff's interests are within the zone of interests to be protected, the court must "first discern the interests 'arguably . . . to be protected' by the statutory provision at issue" and "then inquire whether the plaintiff's interests affected by the agency action in question are among them." *TAP Pharm.*, 163 F.3d at 203 (quoting *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.,* 522 U.S. 479, 492 (1998)).

Plaintiffs bring suit under the APA to invalidate the IRS Rule. (*See* Compl. ¶¶ 8, 40). The ostensible purpose of section 36B is "[t]o ensure that health coverage is affordable," and "to help offset the cost of private health insurance premiums." S. Rep. No. 111-89, at 4 (2009); *see also*

---

[4] To the extent that Plaintiffs assert that they are being injured as taxpayers because the IRS Rule improperly allowed the outlay of billions of dollars in tax credits, their argument fails. *See Howard v. 111th U.S. Cong.*, No. 2:09-CV-25, 2009 WL 1704421, at *3 (W.D.N.C. June 12, 2009).

H. Rep. No. 111-443, vol. II, at 977 (2010). Finally, the IRS Rule pertains to eligibility of individuals for a tax credit under section 36B, as an integral component to the ACA.

Plaintiffs are directly regulated by section 36B and, thus, the IRS Rule interpreting it, because they are "applicable taxpayers" under the section. As taxpayers that are eligible for tax subsidies under section 36B, Plaintiffs' interests are affected by the IRS Rule. The Supreme Court has explicitly stated that the test is not meant to be especially demanding and that any benefit of doubt should go to the plaintiff. *Patchak*, 123 S. Ct. at 2210. It would be a stretch of the imagination to assert that Plaintiffs' "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* As such, Plaintiffs have prudential standing.

### 2. The Administrative Procedure Act and the Tax Refund Alternative

Defendants characterize Plaintiffs' claim as seeking relief that would declare that they have no potential tax liability for 2014 under the Minimum Coverage Provision. They argue that this matter is effectively a tax liability suit and that Plaintiffs must comply with the tax refund scheme under 26 U.S.C. § 7422 and challenge the tax under the Tucker Act, 28 U.S.C. § 1346(a). In response, Plaintiffs argue that they should be able to bring suit under the APA and that a post-enforcement tax liability suit is an after-the-fact remedy that is not an "adequate" alternative to a pre-enforcement injunctive suit under the APA.

Plaintiffs have the better of these arguments because "the tax refund mechanism is inferior to an APA suit and fails to provide complete relief to these plaintiffs." *Halbig*, 2014 WL 129023, at *7. While a tax refund suit would provide an adequate judicial remedy in some ways, it is inferior to an APA suit because it fails to provide complete relief to these plaintiffs. "Relegating plaintiffs' claims to a tax refund action would force plaintiffs to make a choice between purchasing insurance, thereby waiving their claims, or foregoing insurance and incurring the tax penalty, which they will recover much later, and only if they prevail. They also will be deprived of the opportunity to obtain prospective certificates of exemption." *Id.* Further,

10

an "administrative challenge would be futile, as the Secretary of the Treasury can be expected to deny plaintiffs' complaint as contrary to the issued IRS regulations." *Id.*

Moreover, Plaintiffs' claim is not a tax liability suit. In a similar case, *Hobby Lobby Stores, Incorporated v. Sebelius*, corporations sought to enjoin the enforcement of an HHS regulation that required them to provide their employees with health plans that included preventative care. 723 F.3d 1114, 1127 (10th Cir. 2013). The Tenth Circuit held that the corporation's suit was not "challenging the IRS's ability to collect taxes. . . . Rather, they [sought] to enjoin the enforcement of one HHS regulation." *Id.*; *see also Halbig*, 2014 WL 129023, at *8. Similarly, here Plaintiffs are challenging the IRS Rule and not the IRS's ability to collect taxes.[5]

### 3. Ripeness

"A claim should be dismissed as unripe if the plaintiff has not yet suffered injury and any future impact 'remains wholly speculative.'" *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758-59 (4th Cir. 2013) (quoting *Gasner v. Bd. of Supervisors*, 103 F.3d 351, 361 (4th Cir. 1996)). Determining whether administrative action is ripe for judicial review requires courts to evaluate and balance (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration. *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). "A case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." *Doe*, 713 F.3d at 758 (quoting *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006)). The fitness prong prevents a court from considering a controversy until it is presented in "clean and concrete form." *Id.* (citing *Rescue Army v. Mun. Ct. of Los Angeles*, 331 U.S. 549, 584 (1947)). The hardship prong is measured by the immediacy of the threat and the burden imposed on the plaintiff. *Id.*; *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*, 713 F.3d 187, 199 (4th Cir. 2013). In considering the hardship to be balanced against the fitness of

---

[5] It is clear that the Anti-Injunction Act does not preclude Plaintiffs from brining suit for the purpose of avoiding a potential tax penalty under the Minimum Coverage Provision. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2583-84 (2012).

the issues for review, a court may consider the cost to the plaintiff of delaying review. *Doe*, 713 F.3d at 758; *see also id.* at 759.

a.   Fitness for Review

Defendants assert that even if Plaintiffs had standing, the suit is not ripe because the IRS has not yet applied its regulation to Plaintiffs' circumstances. Defendants argue that this matter is not fit for resolution because the Court cannot determine Plaintiffs' potential liability for the tax penalty under the Minimum Coverage Provision. Instead, they assert that Plaintiffs' claims will be ripe after they are taxed because they can then bring a refund action. Plaintiffs reply by arguing this action is presumptively reviewable and ripe because it is a purely legal claim in the context of a facial challenge to the IRS Rule.

Plaintiffs' claim is more accurately described as a broad-based attack on an entire regulatory scheme rather than one based on the possibilities of a particularized application. *See Appalachian Power Co. v. Train*, 566 F.2d 451, 458 (4th Cir. 1977) ("If the regulations are alleged to be invalid as written, we think they must be reviewed expeditiously . . . if the challenge is simply to the manner in which the regulations may be applied in a [] proceeding, then the proper time for review would be on appeal from the issuance or denial . . . .").

In *Hodel v. Virginia Surface Mining & Reclamation Association*, the Supreme Court illustrated the difference between general questions that may be ripe for decision upon enactment of a challenged statute and more specific questions that must await concrete applications. 452 U.S. 264, 294-97 (1981). In *Hodel*, the Supreme Court found ripe, and rejected, a facial challenge to the Surface Mining Control & Reclamation Act of 1977. *Id.* at 295-97. However, it found that more specific claims of uncompensated takings of land were not ripe for review because their determination rested on valuation, estimates of economic impact, and other factual inquiries regarding particular property. *Id.* at 296-97. Similarly, in *Public Utilities Commission of the State of California v. United States*, the United States argued that California could not require common carriers to obtain Commission approval before agreeing to carry

government shipments at negotiated rates. 355 U.S. 534, 538-39 (1958). The Supreme Court found the Government's claim ripe and upheld the claim before any actual application of the administrative procedure at issue. *Id.* at 539.

As stated previously, Plaintiffs will suffer harm as a result of the IRS Rule because they would be subject to the Minimum Coverage Provision penalty or would be forced to buy insurance that they do not want. While the Plaintiffs in this matter are each unique, for the purposes of standing, the Complaint seeks to invalidate the IRS Rule as a whole.[6] Plaintiffs are challenging the facial validity of the IRS Rule, which is a final agency rule that is beginning to affect individuals, including Plaintiffs. *Halbig*, 2014 WL 129023, at *7. As such, Plaintiffs' claim is fit for review.

> b.  Hardship Determination

Plaintiffs' claims are within the ambit of clearly defined Fourth Circuit precedent under *Arch Mineral Corporation v. Babbitt* and other similar cases. *See, e.g., Arch Mineral Corp. v. Babbitt*, 104 F.3d 660 (4th Cir. 1997). In *Arch Mineral Corporation*, a corporation allegedly owed fees and penalties to the Office of Surface Mining Reclamation and Enforcement ("OSM") because it purchased a mine that was delinquent and abandoned. *Id.* at 662. The corporation's liability was based on an ownership or control rule that had yet to proceed through all of OSM's administrative channels. *Id.* at 666. After receiving letters from OSM declaring liability based a presumed link between the corporation and a seller, the corporation sued for injunctive and declaratory relief. *Id.* OSM argued that the case was not ripe because it had not decided as to whether to bring an enforcement action against the corporation. *Id.* at 665-66. However, the Ninth Circuit determined that, for multiple reasons, there was little doubt that OSM intended to enter the corporation into the applicant/violator system in the immediate future. *Id.* at 666.

---

[6] Defendants also contend that, to the extent that Plaintiffs seek a certificate of exemption, this Court is not empowered to award such an exemption because Plaintiffs must apply to the Virginia Exchange for that certificate. Defendants' argument is inapposite because this opinion is not in any way a determination of the validity of Plaintiffs' specific applications.

Thus, the corporation was faced with a "Hobson's choice" of being listed on an applicant/violator system or paying the relevant penalties and suing for a refund. *Id.* at 669 n.2.

In this instance, Plaintiffs risk impending hardship because they face the certainty of either incurring the cost of buying insurance or paying the penalty pursuant to a violation of the Minimum Coverage Provision. *See Atl. Marine Corps Cmtys., LLC v. Onslow Cnty., N.C.*, 497 F. Supp. 2d 743, 749 (E.D.N.C. 2007) ("There is no doubt that injury to plaintiff is more than a mere potentiality and that if defendants prevail in this action they will immediately proceed to tax the properties. No further factual development is necessary, and withholding judicial consideration would cause hardship to the parties and would serve no useful purpose."). This choice is immediate because Plaintiffs must apply for an exemption in the Virginia Exchange in early 2014. Even assuming that the financial burden imposed on Plaintiffs is slight, at least some hardship is present. Moreover, Plaintiffs are challenging the IRS Rule, which is a final agency rule that is beginning to adversely affect individuals, including Plaintiffs. As such, this matter is ripe for review. *See Halbig*, 2014 WL 129023, at *7.

### B. Statutory Interpretation

"*Chevron* deference is a tool of statutory construction whereby courts are instructed to defer to the reasonable interpretations of expert agencies charged by Congress to fill any gap left, implicitly or explicitly, in the statutes they administer." *Nat'l Elec. Mfrs. Ass'n v. U.S. Dep't of Energy*, 654 F.3d 496, 504 (4th Cir. 2011) (quoting *Am. Online, Inc. v. AT&T Corp.*, 243 F.3d 812, 817 (4th Cir. 2001)) (internal quotation marks and alterations omitted). *Chevron* deference requires a court to undertake a two-part analysis to review an agency's regulation. *Chevron U.S.A., Inc. v. Natural Res Def. Council, Inc.*, 467 U.S. 837 (1984). At the first step, a court must look to the "plain meaning" of the statute and determine if the regulation responds to it. *Id.* at 837, 842–43. If it does, the inquiry need not continue. *Id.* At the second step, if the statute is silent or ambiguous, a court must determine whether a given regulation is a permissible construction. *Id.* at 843; *Nat'l Elec. Mfrs. Ass'n*, 654 F.3d at 504.

1. *Chevron* Step One

Under *Chevron,* if a statute is unambiguous regarding the question presented, the statute's plain meaning controls. *Morgan v. Sebelius,* 694 F.3d 535, 537 (4th Cir. 2012). In order to be ambiguous, disputed language must be "reasonably susceptible of different interpretations." *Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.,* 470 U.S. 451, 473 n.27 (1985). At the first step of *Chevron,* a court may also employ traditional tools of statutory construction to ascertain whether Congress has expressed its intent regarding the precise question at issue. *Chevron,* 467 U.S. at 843 n.9; *Nat'l Elec. Mfrs. Ass'n,* 654 F.3d at 504.

a. The Meaning of "Exchange" as Used in Section 36B

The statutory provision that authorizes premium tax credits provides that "[i]n the case of an applicable taxpayer, there shall be allowed as a credit against the tax imposed by this subtitle for any taxable year an amount equal to the premium assistance credit amount of the taxpayer for the taxable year." 26 U.S.C. § 36B(a). Section 36B(b)(2) states that the premium assistance amount determined under the subsection with respect to any coverage month is the amount equal to the lesser of

> (A) the monthly premiums for such month for 1 or more qualified health plans offered in the individual market within a State which cover the taxpayer, the taxpayer's spouse, or any dependent (as defined in section 152) of the taxpayer and which were enrolled in through an Exchange established by the State under [section] 1311 of the Patient Protection and Affordable Care Act, or
>
> (B) The excess (if any) of—
> (i) the adjusted monthly premium for such month for the applicable second lowest cost silver plan with respect to the taxpayer, over
> (ii) an amount equal to $1/_{12}$ of the product of the applicable percentage and the taxpayer's household income for the taxable year.

26 U.S.C. § 36B(b)(2). The term "Exchange" is not defined in section 36B. *See* 26 U.S.C. § 36B.

Plaintiffs assert that the text of section 36B is unambiguous and that the plain meaning of the phrase "established by the State under [section] 1311," in section 36B(b)(2)(A) indicates that Congress intended to refer exclusively to state Exchanges, as opposed to federally-facilitated Exchanges. In essence, Plaintiffs' theory is that: (1) state and federally-facilitated

Exchanges are referred to separately under Section 1311 and Section 1321; (2) section 36B(b)(2)(A) refers solely to Section 1311 when addressing tax subsidies; (3) the omission of any mention of Exchanges under 1321 in section 36B(b)(2)(A) was intentional; and (4) the ACA sometimes refers generically to "an Exchange" or "an Exchange established under this Act" in other provisions. Defendants argue that the word "Exchange" necessarily means "Exchange established under [section] 1311" regardless of whether the Exchange is run by a state or is federally-facilitated.

At first blush, each party presents seemingly credible constructions of the language in section 36B. Viewed in a vacuum, it seems comprehensible that the omission of any mention of federally-facilitated Exchanges under section 36B(b)(2)(A) could imply that Congress intended to preclude individuals in federally-facilitated Exchanges from receiving tax subsidies. However, when statutory context is taken into account, Plaintiffs' position is revealed as implausible.

### b.  Plaintiffs' Reading and the Resulting Anomalies in the ACA

Courts have a duty to construe statutes as a whole. *See, e.g., Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010). Plaintiffs essentially assert that Congress struck a bargain in which it decided to favor state-run Exchanges and contemplated that participants in federally-facilitated Exchanges would not receive tax credits. Plaintiffs aver that Congress's bargain backfired when, to the surprise of all, many states did not opt to create and run their own Exchanges. As such, Plaintiffs fundamentally contend that, to the extent that their reading of section 36B harms the implementation of the ACA, any adverse consequences are the result of a miscalculation by Congress. In contrast, Defendants argue that their interpretation of section 36B is correct because it furthers Congress's intent to provide affordable health insurance for all. Defendants support their argument, in part, by setting forth numerous statutory anomalies that Plaintiffs' reading would incur. Plaintiffs attempt to mitigate these anomalies by either declaring that they do not matter or that they are minimally disruptive to the implementation of the ACA.

As a threshold matter, the ACA provides that if a State has not established its own Exchange by January 1, 2014, the Secretary of the HHS will create "'such Exchange' – that is, by definition under the statute, 'an American Health Benefit Exchange established under [section 1311].'" *Halbig*, 2014 WL 129023, at *13 (quoting 42 U.S.C. § 18041(c); 42 U.S.C. § 300gg-91(d)(21)). Plaintiffs' reading of section 36B grows even weaker when other sections of the ACA are taken into account. So as not to belabor the point, the Court will address the more anomalous results of Plaintiffs' reading of section 36B at length and simply refer in passing to other provisions.

### i.   The Eligibility Provision

Section 1312 of the ACA sets forth provisions regarding which individuals may purchase insurance from the Exchanges. 42 U.S.C. § 18032. Under Section 1312(a)(1), eligible individuals may enroll in any qualified plan to which they are eligible. However, Defendants note that part of the definition of the term "qualified individual" requires that the individual reside in a State that establishes an Exchange under Section 1311 ("Residency Requirement"). *See* 42 U.S.C. § 18032(f)(1)(A)(ii). As such, Defendants aver that, under Plaintiffs' reading of section 36B, no person in a state with a federally-facilitated Exchange could become a "qualified individual."

First, Plaintiffs argue that as a result of the failure of states to establish their own Exchanges, it is natural that individuals living in states with federally-facilitated Exchanges would be ineligible because the eligibility provision only applies to state-run Exchanges under Section 1311. Second, they aver that, even if the eligibility provision is read to apply to persons in federally-facilitated Exchanges, the Residency Requirement should be construed as inapplicable to people in states with federally-facilitated Exchanges.

Plaintiffs' insistence that the Court should read the Residency Requirement out of the ACA or not apply Section 1312 to federally-facilitated Exchanges is a telltale sign that their

reading of section 36B is wrong.[7] If construed literally, the eligibility provision would be nullified when applied to states with federally-facilitated Exchanges, rendering the provision superfluous.

### ii.   Reporting Requirements Under Section 36B(f)(3)

Section 36B(f)(3) directs: "[e]ach Exchange (or any person carrying out 1 or more responsibilities of an Exchange under section 1311(f)(3) or 1321(c) of the Patient Protection and Affordable Care Act)" to provide certain information to the Secretary and to the taxpayer with respect to any health plan provided through the Exchange including:

> (A) The level of coverage described in section 1302(d) of the Patient Protection and Affordable Care Act and the period such coverage was in effect.
> (B) The total premium for the coverage without regard to the credit under this section or cost-sharing reductions under section 1402 of such Act.
> (C) The aggregate amount of any advance payment of such credit or reductions under section 1412 of such Act.
> (D) The name, address, and TIN of the primary insured and the name and TIN of each other individual obtaining coverage under the policy.
> (E) Any information provided to the Exchange, including any change of circumstances, necessary to determine eligibility for, and the amount of, such credit.
> (F) Information necessary to determine whether a taxpayer has received excess advance payments.

26 U.S.C. § 36B(f)(3).

Defendants assert that under Plaintiffs' reading, federally-facilitated Exchanges would perform an "empty act" because they would have to report the aggregate amount of any advance payment of subsidies as zero, and would not have to report any individualized information necessary to determine eligibility for subsidies. Plaintiffs counter with a collective "so what?" (Pls.' Opp'n Mot. Dismiss 10, 12). They aver, without support, that this provision is an example of sensible draftsmanship because otherwise Congress would have had to draft separate sections detailing reporting requirements.

---

[7] Various other provisions of the ACA also reflect an assumption that a state Exchange under Section 1311 exists in each state. *See, e.g.*, 42 U.S.C. § 1396a(gg); 42 U.S.C. § 1397ee(d)(3)(B).

Plaintiffs' explanations are unpersuasive. Under their interpretation, section 36B(f) would be superfluous with respect to federally-facilitated Exchanges under Section 1321 because such Exchanges would not be authorized to deliver tax credits. "Section 36B(f) thus indicates that Congress assumed that premium tax credits would be available on any Exchange, regardless of whether it is operated by a state under [Section 1311] or by HHS under [Section 1321]." *Halbig*, 2014 WL 129023, at *15.

      iii.   <u>Medicaid "Maintenance Efforts" and Clear Notice</u>

Under the ACA, participating states shall maintain their then-existing eligibility standards, until the effective date of the ACA's Medicaid eligibility expansion provisions. 42 U.S.C. § 1396a(a)(10)(A)(i)(VIII). This "maintenance of effort" provision directs states, as a condition for the receipt of federal Medicaid funds, not to impose any "eligibility standards, methodologies, or procedures" under their Medicaid state plan, or any applicable waivers, that are more restrictive than the standards that the state had in place as of the date the ACA was enacted. 42 U.S.C. § 1396a(gg)(1). This condition applies until "the date on which the Secretary determines that an Exchange established by the State under [Section 1311] is fully operational." *Id.* Under Plaintiffs' reading of section 36B, a state with a federally-facilitated Exchange would *never* be relieved of this maintenance of effort requirement. Specifically, under Plaintiffs' reading, states would be obligated by the ACA to maintain their Medicaid program in its current form indefinitely because federally-facilitated Exchanges would never be "fully operational" under Section 1311. Therefore, the HHS Secretary would never be able to release the "condition." This would mean that state's Medicaid programs would be frozen until they opted to create their own state-run Exchange under Section 1311, effectively forcing the states to take action.

Pursuant to the "*Arlington* rule," the federal government must provide clear notice before it uses its Spending Clause powers to impose substantive conditions or obligations on States that they would not otherwise be required by law to observe. *Arlington Cent. Sch. Dist. Bd. of Ed. v. Murphy,* 548 U.S. 291, 298 (2006). "The reason for requiring notice is simple:

19

States cannot knowingly accept conditions of which they are unaware or which they are unable to ascertain." *Sossamon v. Texas*, 131 S. Ct. 1651, 1664 (2011) (quoting *Arlington Cent. Sch. Dist. Bd. of Ed.*, 548 U.S. at 296) (internal quotation marks omitted).

Plaintiffs cite to various examples of the federal government conditioning funds on desired actions (or as Plaintiffs put it, "a too good to turn down" offer). (Pls.' Opp'n Mot. Dismiss 22). However, Defendants' argument based on the Medicaid "maintenance of effort" is fundamentally different from one regarding the mere conditioning of federal funds on desired actions. As Defendants suggest, this potential condition on state's power over their Medicaid programs could be unconstitutional under any number of legal arguments including the *Arlington* rule. This anomalous consequence of Plaintiffs' reading of the ACA and section 36B indicates that Plaintiffs' interpretation is wrong.[8]

### c. Congressional Intent and Legislative History

In an attempt to divine Congress's intent, both parties cite to various legislative history materials including, but not limited to, past versions of the ACA, committee reports, reports by the Congressional Budget Office ("CBO") and Joint Committee on Taxation ("JCT"), and finally, even news media. It is firmly established that legislative history is one of the traditional tools of interpretation to be consulted at *Chevron*'s step one. *Morgan*, 694 F.3d at 538-39; *see also Nat'l Elec. Mfrs. Ass'n*, 654 F.3d at 504-05.

The legislative history of the ACA is long and complex, and many of the past versions of the ACA are not relevant to the current iteration of the ACA. *See generally* John Cannan, *A Legislative History of the Affordable Care Act: How Legislative Procedure Shapes Legislative History*, 105 Law Libr. J. 131, 136 (2013). The very structure of the ACA indicates that "the

---

[8] Other persuasive anomalies arise under other sections including, but not limited to, 42 U.S.C. § 1397ee(d)(3)(C) (regarding children's health insurance plans); 42 U.S.C. § 18031(d)(4)(G) (regarding the creation of an electronic calculator to determine compare the cost of different coverage options); 42 U.S.C. § 18031(d)(4)(I) (regarding information transmission to the IRS); 42 U.S.C. § 18083 (relating to applications made redundant or useless); 42 U.S.C. § 1397ee(d)(3)(B) (requiring HHS to determine, for each state, whether health plans offered through "an Exchange established by the State under [section 1311]" provide benefits for children comparable to those offered in the state's CHIP plan).

Senate passed a bill that provided 'flexibility' to each state as to whether it would operate the Exchange." *Halbig*, 2014 WL 129023, at *17 (citing 42 U.S.C. § 18041). The relevant legislative history indicates that Congress did not expect the states to turn down federal funds and fail to create and run their own Exchanges. Instead, Congress assumed that tax credits would be available nationwide because every state would set up its own Exchange. *See, e.g.*, CBO, An Analysis of Health Insurance Premiums Under the Patient Protection and Affordable Care Act (Nov. 30, 2009) (discussing Exchanges generally when calculating anticipated subsidies across all states); Letter from Douglas W. Elmendorf, Director, CBO, to Rep. Darrell Issa, Chairman, House Comm. on Oversight & Gov't Reform (Dec. 6, 2012) ("To the best of our recollection, the possibility that those subsidies would only be available in states that created their own exchanges did not arise during the discussions CBO staff had with a wide range of Congressional staff when the legislation was being considered.").

What *is* clear is that there is no direct support in the legislative history of the ACA for Plaintiffs' theory that Congress intended to condition federal funds on state participation. *Halbig*, 2014 WL 129023, at *16 (holding that there is no evidence in the legislative record that the House, the Senate, any relevant committee of either House, or any legislator ever entertained the idea of conditioning federal tax credits upon state participation in the creation of the Exchanges). As previously discussed, had Congress intended to condition tax subsidies it would have needed to provide clear notice. While on the surface, Plaintiffs' plain meaning interpretation of section 36B has a certain common sense appeal, the lack of any support in the legislative history of the ACA indicates that it is not a viable theory. The legislative history of the ACA "reveals an intent to grant states the option of establishing their own Exchanges, rather than an intent to coerce or entice states into participating." *Halbig*, 2014 WL 129023, at *17. Further, the text of the ACA and its legislative history evidence congressional intent to ensure broad access to affordable health coverage for all. *See, e.g.*, 42 U.S.C. § 18091(2)(D)-(G); S. Rep. No. 111-89, at 4; *see also* H.R. Rep. No. 111-443, vol. II, at 977.

## 2. *Chevron* Step Two and Statutory Interpretation

Assuming for the sake of argument that the text of section 36B is ambiguous, Plaintiffs' arguments fail at *Chevron* step two. *Chevron* deference is afforded only when an "agency's interpretation is rendered in the exercise of [its] authority [to make rules carrying the force of law]." *A.T. Massey Coal Co. v. Barnhart,* 472 F.3d 148, 166 (4th Cir. 2006) (citing *United States v. Mead Corp.,* 533 U.S. 218, 226–27 (2001)). Defendants assert that the HHS and IRS should receive *Chevron* deference in their interpretation of section 36B and the ACA because the ACA is a "shared-administration" statute and both HHS and the Department of the Treasury are in full agreement about how to interpret the word "Exchanges" within the context of section 36B.

The ACA is a type of shared administration statute in which the HHS and Department of the Treasury perform different functions. Each agency has specifically defined authority.[9] Under section 36B(g), Congress charged the Department of the Treasury with prescribing "such regulations as may be necessary to carry out the provisions of this section." 26 U.S.C. § 36B(g). Under Section 1321(a)(1), Congress charged HHS with setting the standards for meeting the requirements of the section regarding the operation and enforcement of Exchanges and related requirements. 42 U.S.C. § 18041(a)(1). The Department of the Treasury and HHS, however, share some joint responsibility for administering parts of the Act regarding implementation of the tax credit scheme. *See* 42 U.S.C. § 18082(a) ("The Secretary [of HHS], in consultation with the Secretary of the Treasury, shall establish a program under which" advance determinations and payments of tax credits are made.). The two agencies "work in close coordination . . . to release guidance related to Exchanges," and HHS has promulgated its own regulations providing that participants on both state and federally-facilitated Exchanges are eligible for advance payments of the credits. *See* 45 C.F.R. § 155.20; Health Insurance Premium Tax Credit,

---

[9] In fact, the ACA contains more than forty provisions that require, permit, or contemplate rulemaking authority by federal agencies. *See* CBO, Regulations Pursuant to the Patient Protection and Affordable Care Act (P.L. 111-148) (April 13, 2010).

76 Fed. Reg. 50,931-32 (Aug. 17, 2011). The IRS has imported HHS's definition of "Exchange" into the IRS Rule. *See* 26 C.F.R. § 1.36B-1(k).

In *Collins v. National Transportation Safety Board*, the D.C. Circuit explained that there are three types of shared-enforcement statutes: (1) generic statutes that have "broadly sprawling applicability [that] undermines any basis for deference"; (2) "statutes where agencies have specialized enforcement responsibilities but their authority potentially overlaps—thus creating risks of inconsistency or uncertainty"; and (3) "statutes where expert enforcement agencies have mutually exclusive authority over separate sets of regulated persons." 351 F.3d 1246, 1253 (D.C. Cir. 2003). For the most part, the HHS and the Department of the Treasury have mutually exclusive authority under the ACA. Such authority "does not work against the application of *Chevron* deference." *Id.* Accordingly, the IRS is afforded *Chevron* deference in its interpretation of section 36B. Additionally, the HHS is afforded *Chevron* deference in its interpretation of the ACA. Moreover, in cases where "the subject matter of the statute falls squarely within the agencies' areas of expertise, and the Regulations were issued as a result of a statutorily coordinated effort among the agencies, *Chevron* is the governing standard." *Halbig*, 2014 WL 129023, at *12 (quoting *Individual Reference Servs. Grp., Inc. v. FTC*, 145 F. Supp. 2d 6, 24 (D.D.C. 2001), *aff'd*, *Trans Union LLC v. FTC*, 295 F.3d 42 (D.C. Cir. 2002)). As such, *Chevron* deference applies here, where both the HHS and the Department of the Treasury, through the IRS, have coordinated and created a consistent definition of "Exchange" as it applies to the IRS Rule and related HHS regulations.

Even if this Court assumes that Plaintiffs' interpretation of the ACA, section 36B, and related HHS regulations is reasonable, Plaintiffs have not met their burden to show that Defendants' contrary reading is unreasonable. In light of the applicable legislative history of the ACA and the above discussion of the anomalous consequences of Plaintiffs' reading of the ACA, Defendants at the very least have presented a reasonable interpretation of HHS's regulations and, thus, section 36B.

## IV.    CONCLUSION

For the above reasons, Defendants' Motion to Dismiss will be GRANTED. All remaining Motions will be DENIED AS MOOT.

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record.

An appropriate Order shall issue.

> /s/
> James R. Spencer
> United States District Judge

ENTERED this ___/8___ day of February 2014.